Number 14-1897, Messrs. Peterson and Hopkins. Whenever you're ready. May it please the Court, Thomas Peterson for the appellant, Furnival Machinery. I'd like to reserve five minutes for rebuttal. You sure can. In this case, I'd like to ask you a couple of fact questions at the outset. Certainly, Your Honor. How did the endorsement 16 get negotiated? Was it a form that you could pull off the shelf if you asked for it and was willing to pay for it? The record doesn't tell us anything about that, Your Honor. Best as I can tell, this is not a common type of form. Yes, it isn't a pure common. If you look at the cases the party has cited, there's only one where there was a commitment to a renewal. That's the Becker case from the Court of Appeals of Wisconsin, which is consistent with our theory that that's a commitment on the same terms. So it's not, there isn't extrinsic evidence, if you will, Your Honor, explaining the drafting history in the record. But every indication is that this is a fairly distinctive type of provision. That was my impression. When you look at the main policy on page seven, it talks about, or page eight, I should say, for purposes of this section, the quotation of different terms and conditions by the company shall not, which is the insurance company, shall not be construed as non-renewal. And then you go to the endorsement itself, and it looks, you know, it's on a company copy form, but I couldn't tell if it was, maybe we could ask your opposing counsel as to whether it was something that was negotiated or whether it was something that was. I think it's something that's customized for purposes of this particular policy. But again, the record doesn't tell us about that. But let me just do a little clarifying, if I may, of what Your Honor was reading from. Endorsement number 16 modifies section nine of the policy. Nine or five. Well, it says specifically it modifies nine. If you look at the top of it, it says nine. Nine is the provision that talks about freedom to cancel. So that's what it modifies. The provision, Judge Ambrose, you were reading is at the foot of section five of the policy, which is the extended reporting provision. And as long as we're on that subject, let me just clarify. What that's really designed to deal with is the scenario that's presented in some of the cases where if an insurance company submits a non-conforming, an offer of coverage which departs from a prior policy, it sometimes triggers these opportunities to get extended reporting coverage, which is not really what we're here about today. But it's significant because obviously it does show us that the insurance company knows that when it wants to carve out what the definition of a renewal is, it's quite capable of doing that, and it didn't do it with respect to endorsement number 16. So a quotation of different terms and conditions, that would not be the renewal policy? No, Your Honor, that's the quotation process. Because if you look at cases like the Eighth Circuit's decision in the McKeown case, what that case said was that if the insurance company quotes you different terms, that immediately triggers your right to buy the extended reporting coverage. Is this what's referred to as a tail policy? Correct, yes. It gives you a longer period to report something. That happened during the time of the insurance. That's exactly it. This is a claims-made policy. So then let me go back to where I was going to start, which is to say that if the insurance company in this case had sent us at the end of the term a, quote, renewal, there's no question under Pennsylvania law that required them to give us the terms of the existing policy. And our position in this case is quite simply that when they committed to doing that, when they sold us the policy in 2001, where they meticulously explained the circumstances in which they would not renew  that we are equally entitled under Pennsylvania law to have the policy be according to the terms that were presented before. Can it be the case that this policy was negotiated originally in the year 2001, I believe? Yes, I think so. So it was a ten-year policy? Right. With a specific policy premium and the risks were spelled out? Correct. This is a pollution coverage policy. It is. And so subject to renewal in the year 2011, in other words ten years later? Right. So your point is we should have been given the same policy for another ten years with the same coverage and the same policy premiums? Correct. Because that's what Pennsylvania law tells us. So what you negotiated in the year 2001 was an insurance policy in perpetuity? No, it's not in perpetuity because the policy is When I say perpetuity, I mean under the same terms and policy premiums. The policy is limited by the object of the policy, which is the specifically enlisted environmental issues. Environmental coverage by its nature is long-term coverage. Let's keep in mind also there's perfectly logical, they reserve to themselves all sorts of freedom to get out of this policy, which they don't claim any of those things were triggered. Look, for example, there's five reasons they don't have to write the insurance. They lose their reinsurance. I think most important is the fourth, which is item D in endorsement number 16. And that talks about a change in the operations which affects the material risks. So this isn't a perpetual insurance policy. It's not perpetual unless one of those conditions exists. No, I don't think so. It's limited by the object of the insurance, which is environmental remediation. And that's a long-term process anyway. So it's not unreasonable to have written the policy in this way. And I guess at the end of the day I also say, you know, insurance companies would have never written occurrence coverage, and it looks unreasonable if retrospectively we say, well, look what it's done in terms of asbestos liability. Would you say it's unreasonable for them after a 10-year period to offer the same policy with an increased premium? It's unreasonable for them to depart from a commitment that they made, which they could have qualified by saying they had a freedom to change. Now, also, let's keep in mind that this case was not litigated on the basis that they didn't have to ‑‑ that they could have changed the premium, for example. It was litigated on the basis that they could make all these changes, including dropping coverage for the only site where there was a claim, slicing the coverage more than in half, reducing the term from 10 years to one. You know, it would be a much more difficult case perhaps if somebody was saying, no, no, no, we'll give you the same coverage, but we'll change the premium. But it was presented on this, we can make all these changes basis and determine on that basis in the district court. So, Your Honor, I think raises an interesting question perhaps for a future case, which is whether some court might limit the application of this renewal right so that it doesn't affect the premium. Under your interpretation of renewal, does it ‑‑ would the renewal policy have to include the 10-year extension? The right ‑‑ the further right to renewal? Your Honor, I don't ‑‑ it's not at all ‑‑ I don't think that ‑‑ we haven't really litigated that question. I think that's open to serious debate whether that would be part of the right, whether that would be extended as well. And, you know, this is ‑‑ if you think about environmental remediation, what we have to do is prevent the cut and run problem in part, which is that, you know, and let's keep in mind, this hasn't been a bad policy from the insurance company's point of view so far. There's been only one claim and they've paid nothing under the original policy. So, you know, Judge Fuentes, I'm not sure that this has been a bad deal, even if they have to be saddled with the same premium and it's the bargain they made. And let's keep in mind the key principle of Pennsylvania law with respect to the meaning of a renewal is notice to the policyholder. This court in the Stowe Township case in 1975 talked about when you can reform a policy that promises a renewal. And Judge Adams wrote for this court, he listed a series of factors and the last one was the insurance company does not come forward and explain to the policyholder the variation in the coverage. And that's what they didn't do in 2001. And if you look at the policy of the law, it is the burden of the insurance company to give notice. And it's such a strong policy in Pennsylvania that if you look at the shock case, the 1942 Pennsylvania Superior Court case, which then relies on some older Pennsylvania Supreme Court cases, the last paragraph of that case says that it's not even a defense to reformation of the policy, that the insurer got it and could have read it and could have recognized how it had departed from the prior policy. That because the insurance company hasn't come forward and explained the departure, that that's the problem. And that's exactly the kind of problem that we have in this case. There are quite a few cases that say that renewals should be on the same terms as the underlying policy, except where the company provides adequate notice. Correct. And, Your Honor, the point is the notice had to be given at the time the commitment was made, at the time the binding contract was entered into. You mean the original back in 2001? 2001. I'm sorry, but we're talking about renewal. The word renewal here is used in connection with giving adequate notice. That's right. And the word renewal in the policy in 2001, according to the Pennsylvania cases in most places, is telling the policyholder that we will give you the same coverage on the same terms. And that's also reinforced, really, if you look at the carve-outs. Aren't we talking about renewal in 2011? Yes, but it's a promise of renewal in 2011 that becomes a binding commitment in 2001. So I think they have to tell us at that time. What's the point of giving adequate notice? Adequate notice is supposed to be given to us when we enter into a bargain that tells us, in effect, we're going to be able to extend this coverage for 20 years. That's when there's a contractual commitment. And that's the notice we're talking about. It's no different. Conceptually, it's just a different time when the commit was made, as opposed to if they'd given us the commitment when they sent us a policy in 2011 and said here's a renewal without explanation. We're simply trying to enforce the earlier contract that they made. I see in my meeting. You're on our time. It's okay. All right. In response to the questions that Judges Fuentes and Roth have noted pertaining to whether this can be renewed perpetually, I thought you addressed that on page 21 of your reply brief, where you said that the Endorsement 16 does not contain an open-ended promise of perpetual coverage. Yes. So is that essentially, should we interpret that as essentially this is a one-time renewal? Yeah. I mean, I'm not trying to anticipate what the situation is going to be another ten years from now, but I think that may well be a reasonable way to interpret it and consistent with the way we've presented it. I probably won't be around to decide it. You might. I try my best, but you never know. You never know. Right. Yeah. And that's a reasonable, it's reasonable to think the insurance company made that commitment given the extensive information. You know, this policy was written from the point of view that you don't get any coverage of a known loss unless you've listed what they are. You know, they've listed things like EPA study. There's 22 listed items with subparts including a consent decree. This was a policy that could be fully underwrited by the insurance company. You know, I want to just get a little information on one of the provisions in the renewal offer, which is that Indian Harbor excluded coverage for a specific contaminated site. Is that correct? Correct. That's right. What reason was given for that? Now, the policy is to cover remediation of that. That's right. The reason that was given is there's an email in the record from their, someone at the Indian Harbor that says that they didn't think that they could adequately underwrite the risks that were associated with that particular site. Was that a new risk or was that an underwriting? No, that was one of the listed, that's the Elizabethtown site. That was one of, I think, the 12 listed covered locations. The impression I'm getting is that it was getting too expensive to fix. No, they haven't paid anything yet, Your Honor. There wasn't even a claim as to that site until the end of 2011. I see. It was the subject of a consent decree before 2001, so they could see entirely what the issues were. So this was a risk that was unknown to Indian Harbor? Well, it was known to them before they wrote the policy in the first place because it was scheduled as one of the specific sites as to which there were existing environmental issues. And let's keep in mind also that the way the policy was written, the fourth opportunity they had to not renew the policy was if a change in the operations of the insured caused a change in their risk. Well, my client, Fernaval, went and stopped being an operating company in 2006. So there was nothing they were doing which could in any sense increase the risk. And I think, Judge Wendt, that just reinforces the idea that there's nothing at all unreasonable in thinking that in this particular context an insurance company could write a long-term policy and include even an extension of it. It's just a question of how much further they wanted to look off into the future, and that's the promise they made and the one that we ask you to enforce. Thank you. Thank you. We have Mr. Hopkins. It pleases the Court. Joel Hopkins for Indian Harbor Insurance Company. Let me ask you at the outset of this some of the same questions I asked your opposing counsel, Mr. Peterson. Do you know how this Endorsement 16 or have any idea how it got added to this policy? These are typically what are called manuscript forms. They are not standard forms. Indian Harbor is what's called a surplus lines insurer, so that means its forms aren't filed or approved by insurance departments. So all of these are typically manuscript written by the carrier. But is this something that, let's say, an agent could pull off the shelf, Endorsement 16, or is this something that's negotiated? It is typically something that's negotiated, particularly on a specialty type of policy. This is a very unique type of coverage dealing with pollution types of risks. So, in effect, what you've got there is a sophisticated business is what you're saying, as I understand, and you are as well, and you've negotiated this. So when I look at this, and maybe I'm just reflecting the principles that one often sees in my home state of Delaware where people, if you make a contract, that's it, especially in the alternate entity areas where you really see it. But here you've got, under Endorsement 16, the insurer and the company agree that the company may cancel at any time or refuse to offer a renewal extension of coverage for the following reasons, and it lists four reasons, and they seem to cover quite a bit, material change in the operations, for example. And then you add a fifth in the next section, a loss of reinsurance or a substantial decrease in reinsurance has occurred. And then you say at the end the company agrees that it shall not non-renew this policy except for the reasons stated above. That's about as unambiguous as it gets. You know, when it comes down to those, what is a renewal? And counsel has said the law of Pennsylvania is very clear, and it is very clear. But non-renew this policy. Right. And a renewal, a non-renewal, would be to say I offer you no terms, I offer you nothing at the expiration of this policy. If you look at the Shock, the Stowe Township case, the Contencio case that was decided by this court, every one of them says a renewal occurs and exists if, when terms, excuse me. You finish and then I'll add. When new terms are proposed, made aware, the insured is made aware of those terms prior to that renewal, when that is put into place, that constitutes a renewal. And the insured agrees to it. Absolutely. The offer, and they agree to it by accepting it. And once they accept that, that becomes a renewal. So where is the acceptance here by the other side, F&M Equipment, of your proposed changes? They never accept those proposed changes. And what happens, Judge Ambrose, is essentially they have refused our offer to renew the policy. And there's a lot of common sense here. But, of course, that's because you changed the terms of the policy. It is. It is, Your Honor. Ultimately, when it comes down to the common sense of a renewal, anybody who has an automobile insurance policy, a homeowner's policy, we all know, particularly in Pennsylvania, there are statutes of governance that say those policies have to be renewed except for certain conditions. But when they're renewed, has any of us ever expected not to see, perhaps, an increase in policy premium? Has any of us ever expected not to see, perhaps, a change in the policy terms, for example, for statute changes? This is a great question to have asked the people who negotiated this in 2001, the people inside the committee. Why in the world did you not do this? But when you're big boys and girls and you make an agreement, that's pretty much it. And this is about, as I said, I can't see any ambiguity in this. I agree. And precisely for the purposes of this case, we agreed that these terms of this term and this language was unambiguous. No ambiguity works against you, I think. I think not, because when the court looks, without finding an ambiguity, the court can still look at the cases that interpret and say, what is a renewal? And a renewal of a policy is a continuation of coverage, and the terms may be different where the insured receives notice of those terms prior to them being put into place. Well, renewal is an offer for a new policy. What is renewal extension of coverage? Well, and that's a little bit of a red herring, because remember what it says. It says an extension of coverage. When you extend coverage, it means the coverage that's available under the policy will be extended out further. But what it doesn't say is it doesn't say that the terms and conditions of that renewal will be precisely the same. And, in fact, they're not. And I think counsel actually made a pretty interesting point about this. He said, it seems to agree that the premium could be changed. I think in response to Judge Roth's question, said, not so sure about the 10-year renewal term, whether that would be included. No, the 10-year renewal term after the renewal term. After the renewal, correct, as to whether it becomes a perpetual policy. And really what that recognizes is that recognizes that it is absolutely unreasonable to suggest that this type of policy could continue 10 years, after 10 years, after 10 years, under the same premium. But his answer was one that reminded me of former Chief Judge Becker. That's the next case. Your Honors, I think when you look at this, you're covering a very specific type of incident, which, as I understand it, you were fully aware of when you issued this policy in the first instance. So you knew what the risk was. And the risk, what I'm saying is the common understanding is it's a very specific risk. It's not like an automobile insurance policy. But again, Your Honor, it comes down to when we said we would renew. What does the term renew mean? Everyone in the insurance world understands. Everybody in the business world understands that when your policy comes up for renewal, there's a renewal process. Many times you submit a renewal application. And the difference between an existing policy and a renewal policy is this. You don't re-underwrite, but you look at changes in conditions between the time the policy was originally put into place and when the renewal period comes up. So for example, a simple example of my personal automobile policy, if I sell a car after my policy is put into place, I call my agent at the time of renewal and I say, I don't own that car anymore. My 16-year-old daughter now gets her license. I say, my 16-year-old daughter now has her license. The premium changes, the terms of the policy change. And what happened here, and I think Judge Fuentes had asked this, with the Elizabethtown site, a claim was made two days before this policy expired for the Elizabethtown site. And counsel, I think, suggested in Although there was a tail anyway, right. There was a tail coverage if the policy had been deemed to have non-renewed, which also goes back to the inconsistency. How can the extended reporting provision provide that an offer of different terms and conditions is not a non-renewal for purposes of purchasing the extended reporting period, but it is for these purposes? It makes no sense. Your argument would be, in terms of increased premium, et cetera, would be spot on if you didn't have endorsement 16. Endorsement 16 basically says, you take this policy and we're going to have new terms that are going to apply to a particular section and they're going to relate to renewing or extending this coverage for another period of time. And that's why the question for this court and the question decided by the district court was, when they committed to offer a renewal, did they? When they offered those different terms, does that constitute as a matter of renewal?  Where do any words in endorsement 16 talk about an offer to renew? Well, it says that it will non-renew and obviously at the time of a renewal. And actually, by the way, it's interesting because if the argument were, gee, all this is is just extending the policy period, that can be done. But what you have in one is you can refuse to offer a renewal extension for the following reasons, one, two, three, four. In addition, if there's a loss of insurance or substantial decrease, then you can refuse to offer a renewal extension. Other than that, you're out of luck. Judge Ambrose quoted Judge Becker, and I've got another quote from him, not word for word, but one thing he often said was that insurance cases are easy because if the insurance company goofed and put something in a policy they don't like, they can change the policy in the future and it's just a matter of money. And, you know, frankly, I look at insurance cases that way, and I think I need a little more argument from you if I'm going to come off that position to see how you could renew with such a change in coverage as you are presenting to us today. And, Judge Roth, that's a very interesting point because, to follow that quote, that could never happen in this case because nothing could ever change forever. This policy would be subject to the same terms, the same premium, the same conditions. Okay. You lose on this policy, but the next time you do one of those, you know how to word it better. Well, and I think this one actually is worded correctly because, to get back to Judge Ambrose's point, the question is whether a renewal was offered and whether it was rejected. The district court said yes, and a renewal was offered because, as all of the cases in Pennsylvania say, a renewal can be on different terms where those terms are brought to the insured's attention, which is exactly what happened here. And, Judge Ambrose, to answer your question, perhaps the curiosity as to, geez, well, why isn't this just a continuation of coverage? The Penn Township case, it's a spirit court case from 1998, answered that question. And it said, if you want to extend the coverage under the exact same terms and conditions, you do that by extending the policy, period. But the entire concept of a renewal. The problem is that that phrase is followed by four specific events that did not occur in this case. That's correct. And those four specific events, several of them exist for regulatory reasons. I understand that, but, I mean, there's a semicolon there which suggests that the four reasons have to be satisfied. We agree that none of those, we stipulated for these purposes, that none of those exist in this case. So what we come down to is Indian Harbor had the obligation to offer a renewal policy. And the question for the district court and the question for this court is, was the offer that included those different terms, different terms that, by the way, were not pulling a carpet out from anybody. You can't insure an Elizabethtown site when a claim is made two days before a policy expires, and that loss has already been covered. Remember, this is claims made coverage. Loss has already been covered. In their brief, I think it was suggested that GIA insurer would be happy to charge premium, to continue to charge premium for the Elizabethtown site. Would be happy to? It would be bad faith to, because it would be illusory coverage. There's nothing that could be provided for the Elizabethtown site on a going forward basis once that loss occurred. So the question – So then what's the problem with keeping it on the policy? Well, because essentially what you would be doing if you were forced to charge the same premium and keep the location on the policy is you would be charging a premium for a coverage that would not actually be included. It would be more expensive for you to comply with the existing contract. I'm sorry, I don't understand. It would be more expensive for you to comply with the existing contract, because now you have to cover an additional risk. There is no coverage, because the policy, once a claim is made – But, I mean, if this contract were enforced as Mr. Peterson wants, you would have to cover the Elizabethtown site. The Elizabethtown site is covered under the prior policy, the one that expired in 2009. But if the Elizabethtown site is covered in one corner under the private policy, they found something, and if next year they find something in the other corner of the property that needs remediation, they won't have any coverage. As Mr. Peterson pointed out, the policy covers disclosed and known conditions. That claim, which was made two days before the expiring policy actually expired, that claim was made, coverage is triggered, and the losses stemming from it are covered under that policy. There would be no coverage going forward. It does seem unfair, inequitable, that you would have to cover the same risk for the same premium as was being paid 10 years before. But I'm wondering if you could not have contracted for that. In other words, could you not have said in the contract that premium payments shall be reconsidered at the time of renewal? I think, Judge, absolutely, in hindsight, would we not be here if we included a whole bunch of other flowery, lawyerly language? Absolutely. But the legal question for the court on the unambiguous term is, what is a renewal, and was that provided here? And because the law of Pennsylvania is extremely clear that a renewal can include new terms where they are brought to the insurer's intention, and that's what happened here, the terms of the policy were satisfied. Did we offer a renewal? Absolutely. If you look at all of the Pennsylvania cases, that was done. In your endorsement, all you have to do is not put flowery language in the endorsement 16. All you have to say is, renewal subject to negotiation over premium, comma. Which would be, in our argument, would be redundant with the term renewal because of the cases. And everybody in the insurance world and in the commercial world understands. But if you were back in 2001, even if accepting what you just said, you would say to somebody, dude, be redundant. Wow. And then we would be chastised as lawyers for using too many words. I don't think so. I think in this case the term renewal is very clear. It was offered, and that was when the additional terms were brought. Based on the questions that you're getting, I'm wondering if it is clear. And so the phrase renewal extension of coverage can be interpreted two different ways. So if it is ambiguous, then that would be held against you, wouldn't it? It would be interesting if it's ambiguous considering we stipulated that it was not. If you're right, why is there not some type of trade usage that you would have brought into play here to educate everyone as to what the words renewal extension mean? Excellent point. The reason we didn't is because we had stipulated this was stipulated to the facts, stipulated to the fact that it was not ambiguous, and this was done on a summary judgment motion that was decided in our favor. That sort of extrinsic evidence was never brought into play. So if we decide it is ambiguous, does it have to go back to the district court for further? Your Honor, I thought about that last evening and struggled with the answer because it is kind of peculiar that we stipulated it's not ambiguous. I think if the court finds it is ambiguous, perhaps that is the result that it has to go back for a determination. You and Mr. Peterson decided and agreed that it was not ambiguous. Correct. We acted at the district court. Council agreed that it was not ambiguous. All right. Thank you very much. Thank you, Your Honor. Mr. Peterson, let me ask you a question. Yes, Your Honor. Mr. Hopkins has said that because the Elizabethtown claim is covered by the 2001-2011 policy, what is the need to have Elizabethtown still on the policy? I think it probably has more to do with what the limits of coverage may very well be because the argument has been made that there is a provision in the policy which says that the limits, if you have occurrences or injury in more than one policy period, that that would all be attributable to one limit, but that is subject to a factual inquiry about what the nature of the damages. They are all things that depend on what happens in Elizabethtown. So I think that is much of what the debate may well be about. It is about what the limits of the coverage are. And so hence, you know, it is not as though they are being asked to take our money and somehow that that is going to be a gross imposition on their part. I mean, they haven't had to pay anything so far on this coverage, so I don't quite understand the suggestion that Elizabethtown could be eliminated on that basis. I would like to go back to sort of the basic principle of Pennsylvania law here, and in most jurisdictions, what does a renewal mean? And again, I think this case has a lot to do with simply focusing on time. My friend says, well, it means we can tell you later what the terms are going to be and how they can be different, but the point is they made a contract in 2001, and that is the point at which they had to give us the notice. I think that is the key to this case and the point that the district court overlooked. My friend talked about this question of premium. I would just like to clarify the conversation I believe I had with you, Judge Fuentes. It is perfectly reasonable to say that a price term is a term which has to stick when you have a renewal policy in Pennsylvania. The Flanagan case, not an insurance case, but nevertheless talks about renewal. That is about a price term. That is about what the interest rate is going to be on a certificate of deposit. I think the point I was trying to make, Your Honor, in our discussion was if you had a case where you had a renewal and the only question was whether the premium could be varied, I think that presents an interesting close case, but that is not this case because, again, my friend says that they had to offer us coverage, and they made us an offer of coverage, but quite a different coverage. It dropped the site. The limits went from $14 million to $5 million. It went from a 10-year policy to a one-year policy. Even if you think that they had an obligation to offer coverage, presumably that would mean they had an obligation to cover the same things to the same extent, and that is not what they proposed to do in this case. The extended reporting period, Judge Ambrose, you and I had a discussion about this at the outset. That provision of the policy, first it demonstrates that they very well know, because they did in that section, how to say that a renewal doesn't have to be on the same terms because they talked about how they could extend in that context a quotation of different terms and it wouldn't trigger extended reporting coverage. But more importantly, again, that provision of the policy is really directed to a different thing. That's part of their standard policy. That's not an endorsement, and that, as they say, it's directed for them to address the law in various jurisdictions like the Eighth Circuit where the courts have held that if I send you a proposal of coverage which departs from the terms of a prior policy, that immediately triggers your right to buy the reporting coverage. Do you agree that there's no ambiguity in the provisions that we have been discussing? I agree that my colleagues in the district court stipulated that there isn't, and I think that's right. I think you have the universe. The parties certainly had an opportunity. Even if you agree, or you think rather, that there's an ambiguity in the policy, you have the universe of the relevant information, so I think that then becomes a judicial decision. I'd like to get your take on this Pennsylvania case because we are interpreting Pennsylvania law. This is a right-side case, but it's out of the District of Delaware. But it provides that the rule in Pennsylvania and other jurisdictions is that the delivery of a policy as a renewal, which is this case, in the absence of notice or explanation that the terms of the policy have been altered, which is what your adversary says has occurred, contemplates the same terms and conditions as the existing insurance. Correct. So doesn't that suggest or contemplate that there can be notice and explanation of new terms in the policy? No, because I think the relevant time, again, I think, Your Honor, it's a time question. The relevant question is when does the notice have to be given. The notice has to be given when they commit to giving you a renewal without qualification, other than these five examples of things that let them not renew, which aren't applicable. And I go back to the point I made fairly early, which is, suppose there was no – if they sent us in 2011, here's a renewal. We didn't have to read it. If it wasn't exactly like our current policy, Pennsylvania law says we could come into this court and ask you to reform it to be exactly in conformity. When they promised in 2001 they would renew without further qualification, that's the point at which the promise becomes enforceable, and that's what we're asking you to hold. Thank you very much. Thank you. Thank you both, counsel, for a very well-presented argument. We'll take the matter under advisory.